```
_____
                                   :
GABRIEL ACOSTA,                    :
                                   :
          Plaintiff,               :    Civ. No. 12-6614 (NLH)
                                   :
     v.                            :    OPINION
                                   :
WARDEN SCHULTZ, et al.,            :
                                   :
          Defendants.              :
_____:
```

**APPEARANCES:**

GABRIEL ACOSTA
74749-053
F.C.I. FORT DIX
P.O. BOX 2000
FORT DIX, NJ 08640
     Appearing pro se

FRANCES C. BAJADA
OFFICE OF THE U.S. ATTORNEY
970 BROAD STREET
NEWARK, NJ 07102
     On behalf of Defendants

**HILLMAN, District Judge**

     Plaintiff, Gabriel Acosta, claims that two current employees and one former employee of the Federal Correctional Institution at Fairton, New Jersey, violated his Eighth Amendment rights relating to his medical care.  Plaintiff was

treated after a physical altercation with another FCI Fairton

inmate on October 19, 2010.[1]

Defendants have moved for summary judgment, arguing that

they are entitled to judgment in their favor on Plaintiff's

claims because Plaintiff has failed to exhaust his

administrative remedies.  They also argue that Plaintiff has

failed to offer sufficient disputed material facts on the issue

of whether Defendants were deliberately indifferent to his

serious medical needs.  For the reasons expressed below,

Defendants' motion will be granted.

**BACKGROUND**

On October 19, 2010, at about 6:40 p.m., Plaintiff was

involved in a physical altercation with another inmate at FCI

Fairton.  A Recreation Specialist and Correctional Counselor

noticed that Plaintiff appeared to be severely beaten around the

face.  The staff members then secured Plaintiff in the gym

office and escorted him to the Health Services Unit (the "HSU")

for medical evaluation.

At around 6:50 p.m., Registered Nurse Sharon Cooke

evaluated Plaintiff:

> Inmate claims he lost consciousness and does not know how
> long he was out. Inmate presents with left eye bruised and
> swollen shut. Multiple abrasions on back and right forearm.
> Abrasions bilateral knees laterally. Upper lip split

---

[1] Plaintiff is currently a federal inmate at the Federal
Correctional Institution in Fort Dix, New Jersey.

medially. Puncture wound lateral 5th metacarpal area. Lump
left side of head behind left ear, lump right temporal
area, abrasions and lump occipital bone. Bruising left
upper arm.

Inmate is awake and is alert to person. Very confused.
Unable to ambulate unassisted. Nausea. Follows simple
commands. Decreased strength left upper extremity.
Hemodynamically stable. Right eye with pupil reactive to
light. Unable to assess left eye at this time.

(Docket No. 55-2, BOP 000230.)

After evaluating Plaintiff, Nurse Cooke called Dr. Ruben B.

Morales, the Clinical Director of FCI Fairton, by telephone to

report Plaintiff's medical condition, and Dr. Morales gave a

verbal order authorizing Plaintiff's transport by ambulance to

an outside hospital.  On October 19, 2010, at 8:00 p.m.,

emergency medical services were called to transport Plaintiff to

the hospital.  Somewhere between 8:04 p.m. and 8:17 p.m.,

Plaintiff was transported by ambulance to the South Jersey

Healthcare Regional Medical Center in Vineland, New Jersey,

arriving at 8:58 p.m.

After an examination, which included a CT scan of the

brain, Plaintiff was diagnosed with a nasal bone fracture with

extensive left periorbital soft tissue swelling, hand sprain,

abrasion and joint pain of the pelvis.  The discharge

instructions recommended a follow-up examination as soon as

possible to re-check his complaints.  It was noted that

Plaintiff could take Tylenol for pain, and he needed to see an

Ear, Nose and Throat ("ENT") specialist for the nasal bone fracture. The medical notes further provided that the x-rays were preliminary, and an official reading would be released from the hospital at a later time. The records stated that during the next 24 hours, someone had to stay with Plaintiff, and this person should wake him every two hours. The report from the CT scan performed at the hospital provides, in pertinent part: "Moderately extensive left cheek, periorbital and supraorbital scalp soft tissue swelling. Left periorbital extracoronal dematous/hemorrhagic infiltration with preservation of intraconal fat. Left lobe is grossly intact, ophthalmologic evaluation advised."

Plaintiff returned to FCI Fairton on October 20, 2010, at 2:34 a.m. Upon his return to FCI Fairton, Plaintiff was placed in a single-person cell in the SHU.[2] At 7:30 a.m. on October 20, 2010, SIS staff interviewed Plaintiff in the SHU about the physical altercation, and Plaintiff gave an oral statement. When Dr. Morales reported to work at 7:30 a.m. on October 20, 2010, he reviewed Plaintiff's hospital discharge records. At

_____

[2] Defendants explain that it is not uncommon for inmates to be placed in the SHU upon returning from outside hospitals when medical staff is not present on site at FCI Fairton because inmates must be medically cleared to return to the general population. Further, when an inmate is injured by another inmate an investigation must typically be completed to determine whether it is safe for his return to the general population.

approximately 9:26 a.m., Dr. Morales performed a follow-up examination of Plaintiff in the SHU.  In the Clinical Encounter notes from October 20, 2010, Dr. Morales indicated that Plaintiff had suffered a head concussion, nose fracture, hand sprain and abrasion, and he complained of pain in the face and nose.  He further noted: "apparently injuries were the result of an assault, inmate was immediately transferred to emergency room last night, discharge report indicated this inmate was diagnosed to have sustained concussion with wake up, fracture, nose (with X-ray), abrasion and sprain hand."  (Docket No. 55-2 at 17, BOP 00027.)

Dr. Morales noted that Plaintiff reported a pain level of five, and he was alert and oriented as to person, place and time.  Dr. Morales noted that Plaintiff had symmetry of motor function, tenderness on palpation, raccoon eyes, deformity, abrasion(s), trauma and swelling, while noting there was no facial asymmetry, fluid/blood from his ears, or fluid/blood from his nose.  Dr. Morales further observed that while the left orbit, upper eyelid, and zygoma were severely swollen and tender, Plaintiff had full ocular movement, could read letters from a distance of five feet, and could open his mouth without difficulty.  Dr. Morales diagnosed Plaintiff with "[c]oncussion w/prolong loss of conscious and return" as well as a "[n]ose, fracture, closed."  Dr. Morales prescribed Meloxicam

(a non-steroidal anti-inflammatory drug) for Plaintiff's
shoulder pain.  He instructed Plaintiff to place ice on his left
eye to relieve swelling.  Dr. Morales noted that he would
"follow up for the official report of the CT scan and nasal bone
X-ray and will continue monitoring."  He noted that he would
"consider ENT consult for nasal fracture if necessary."

On October 22, 2010, at 9:12 a.m., Dr. Morales conducted a
follow-up examination of Plaintiff in the HSU.  Plaintiff
complained of pain in the back of his neck.  He also reported
forgetfulness and difficulty breathing through his nose due to
severe congestion.  Dr. Morales' notes reflect that Plaintiff
sustained a brain concussion from an assault, suffered a nasal
fracture and a CT scan of the brain showed no hemorrhage.
During this examination, Dr. Morales conducted a cover-uncover
test and determined that Plaintiff's eyes were normal, although
he suffered periorbital swelling, tenderness and hematoma.  In
addition, Plaintiff had full ocular movement, and his pupils
reacted equally to light.  Dr. Morales decided not to refer
Plaintiff for an ophthalmology consultation based upon his
clinical impression that such a referral was not medically
necessary.

As to Plaintiff's nose, Dr. Morales noted "[l]eft turbinate
swollen, ridge of nose slightly swollen and tender, some blood
clot in the wall/turbinates."  He diagnosed Plaintiff with a

closed nasal fracture. He prescribed Ibuprofen and one puff per nostril two times daily for 30 days of Flunisolide Nasal (Nasalide) for the nasal fracture. Dr. Morales requested an Otolaryngology consultation because Plaintiff sustained a nasal bone fracture and complained of difficulty breathing, and the ridge of his nose was slightly swollen and tender. Dr. Morales instructed Plaintiff to return immediately if his condition worsened.

On November 4, 2010, at 8:46 a.m., Plaintiff was examined by mid-level practitioner Satish Limbekar in the SHU. Plaintiff complained of nasal congestion, a sore throat and myalgia. It was noted that he had a nasal bone fracture after an assault, and he was pending an ENT consult. After an examination, he was diagnosed with an acute upper respiratory infection. He was prescribed Erythromycin, and his prescription for Flunisolide nasal solution was renewed. He was told to seek follow-up at sick call and given a supply of Motrin.

On November 5, 2010, Plaintiff was taken to an outside consultation with an ENT specialist, Dr. Rodolfo Diaz. Mid-level practitioner Limbekar noted that once the recommendations were reviewed, FCI Fairton would follow up accordingly. Based upon Dr. Diaz's notes regarding his evaluation of Plaintiff on November 5, 2010, mid-level

practitioner Marylin Angud noted "[n]egative findings; no nasal obstruction, airway is patent; no cosmetic deformities noted."

On December 7, 2010, Dr. Morales evaluated Plaintiff in the HSU. Plaintiff complained of chronic shoulder and back pains, which improved with exercise and were currently asymptomatic. He was diagnosed with chronic right shoulder pain which had improved. He was removed from the chronic care clinic list because there was no need for regular follow-ups. He was told to report to sick call as needed.

On December 20, 2010, Plaintiff was evaluated by mid-level practitioner Limbekar for a skin rash on his abdomen. He was diagnosed with dermatitis/eczema from an unspecified cause and prescribed Fluocinonide Cream. After December 20, 2010, Plaintiff did not report to the HSU at FCI Fairton for any medical issues. He remained in the SHU until January 11, 2011, when he was transferred from FCI Fairton to another federal prison.

Based on the foregoing events, Plaintiff claims that the Defendants - Special Investigation Services ("SIS") Technician Polly Davenport, Lieutenant Daniel McCabe, and Dr. Morales - were deliberately indifferent to his serious medical needs in violation of his Eighth Amendment rights. Defendants have moved for summary judgment in their favor, arguing that Plaintiff's claims are barred because he failed to exhaust his

administrative remedies prior to filing suit against them.
Defendants also argue that even if Plaintiff did exhaust his
administrative remedies, his claims are unsupportable.
Plaintiff has opposed Defendants' motion.

**DISCUSSION**

**A.    Summary Judgment Standard**

Summary judgment is appropriate where the Court is
satisfied that "'the pleadings, depositions, answers to
interrogatories, and admissions on file, together with the
affidavits, if any, show that there is no genuine issue as to
any material fact and that the moving party is entitled to a
judgment as a matter of law.'" Celotex Corp. v. Catrett, 477
U.S. 317, 322, 106 S. Ct. 2548, 91 L.Ed.2d 265 (1986) (citing
FED. R. CIV. P. 56).

An issue is "genuine" if it is supported by evidence such
that a reasonable jury could return a verdict in the nonmoving
party's favor. Anderson v. Liberty Lobby, Inc., 477 U.S. 242,
248, 106 S. Ct. 2505, 91 L.Ed.2d 202 (1986).  A fact is
"material" if, under the governing substantive law, a dispute
about the fact might affect the outcome of the suit. Id.  "In
considering a motion for summary judgment, a district court may
not make credibility determinations or engage in any weighing of
the evidence; instead, the nonmoving party's evidence 'is to be
believed and all justifiable inferences are to be drawn in his

favor.'" <u>Marino v. Indus. Crating Co.</u>, 358 F.3d 241, 247 (3d
Cir. 2004) (citing <u>Anderson</u>, 477 U.S. at 255).

Initially, the moving party bears the burden of
demonstrating the absence of a genuine issue of material fact.
<u>Celotex</u>, 477 U.S. at 323 ("[A] party seeking summary judgment
always bears the initial responsibility of informing the
district court of the basis for its motion, and identifying
those portions of 'the pleadings, depositions, answers to
interrogatories, and admissions on file, together with the
affidavits, if any,' which it believes demonstrate the absence
of a genuine issue of material fact." (citation omitted); <u>see
also</u> <u>Singletary v. Pa. Dept. of Corr.</u>, 266 F.3d 186, 192 n. 2
(3d Cir. 2001) ("Although the initial burden is on the summary
judgment movant to show the absence of a genuine issue of
material fact, 'the burden on the moving party may be discharged
by "showing" — that is, pointing out to the district court-that
there is an absence of evidence to support the nonmoving party's
case' when the nonmoving party bears the ultimate burden of
proof.") (citing <u>Celotex</u>, 477 U.S. at 325).

Once the moving party has met this burden, the nonmoving
party must identify, by affidavits or otherwise, specific facts
showing that there is a genuine issue for trial. <u>Celotex</u>, 477
U.S. at 324.  A "party opposing summary judgment may not rest
upon the mere allegations or denials of the ... pleading[s.]"

<u>Saldana v. Kmart Corp</u>., 260 F.3d 228, 232 (3d Cir. 2001)

(internal quotations omitted).  For "the non-moving party[ ] to

prevail, [that party] must 'make a showing sufficient to

establish the existence of [every] element essential to that

party's case, and on which that party will bear the burden of

proof at trial.'" <u>Cooper v. Sniezek</u>, 418 F. App'x 56, 58 (3d

Cir. 2011) (citing <u>Celotex</u>, 477 U.S. at 322).  Thus, to

withstand a properly supported motion for summary judgment, the

nonmoving party must identify specific facts and affirmative

evidence that contradict those offered by the moving party.

<u>Anderson</u>, 477 U.S. at 256–57.

   **B.   Bivens**

   In <u>Bivens v. Six Unknown Fed. Narcotics Agents</u>, 403 U.S.

388, 91 S. Ct. 1999, 29 L.Ed.2d 619 (1971), the Supreme Court

held that a violation of the Fourth Amendment by a federal agent

acting under color of his authority gives rise to a cause of

action against that agent, individually, for damages.  The

Supreme Court has also implied damages remedies directly under

the Eighth Amendment, <u>see</u> <u>Carlson v. Green</u>, 446 U.S. 14, 100 S.

Ct. 1468, 64 L.Ed.2d 15 (1980), and the Fifth Amendment, <u>see</u>

<u>Davis v. Passman</u>, 442 U.S. 228, 99 S. Ct. 2264, 60 L.Ed.2d 846

(1979).  But "the absence of statutory relief for a

constitutional violation does not necessarily mean that courts

should create a damages remedy against the officer responsible

for the violation." Schreiber v. Mastrogiovanni, 214 F.3d 148,
152 (3d Cir. 2000) (citing Schweiker v. Chilicky, 487 U.S. 412,
108 S. Ct. 2460, 101 L.Ed.2d 370 (1988)).

Bivens actions are simply the federal counterpart to § 1983
actions brought against state officials who violate federal
constitutional or statutory rights. See Egervary v. Young, 366
F.3d 238, 246 (3d Cir. 2004), cert. denied, 543 U.S. 1049, 125
S. Ct. 868, 160 L.Ed.2d 769 (2005). Both are designed to
provide redress for constitutional violations. Thus, while the
two bodies of law are not "precisely parallel", there is a
"general trend" to incorporate § 1983 law into Bivens suits.
See Chin v. Bowen, 833 F.2d 21, 24 (2d Cir. 1987).

## C.   Eighth Amendment Deliberate Indifference Claim

The Eighth Amendment proscription against cruel and unusual
punishment requires that prison officials provide inmates with
adequate medical care.  Estelle v. Gamble, 429 U.S. 97, 103-04
(1976).  In order to set forth a cognizable claim for a
violation of his right to adequate medical care, an inmate must
allege: (1) a serious medical need; and (2) behavior on the part
of prison officials that constitutes deliberate indifference to
that need.  Id. at 106.

To satisfy the first prong of the Estelle inquiry, the
inmate must demonstrate that his medical needs are serious.
"Because society does not expect that prisoners will have

unqualified access to health care, deliberate indifference to medical needs amounts to an Eighth Amendment violation only if those needs are 'serious.'" Hudson v. McMillian, 503 U.S. 1, 9, 112 S. Ct. 995, 1000, 117 L. Ed. 2d 156 (1992)

Serious medical needs include those that have been diagnosed by a physician as requiring treatment or that are so obvious that a lay person would recognize the necessity for a doctor's attention, and those conditions which, if untreated, would result in lifelong handicap or permanent loss. See Johnson v. Stempler, 373 F. App'x 151, 153 n.1 (3d Cir. 2010) (citing Monmouth County Correctional Institutional Inmates v. Lanzaro, 834 F.2d 326, 347 (3d Cir. 1987), cert. denied, 486 U.S. 1006 (1988)).

The second element of the Estelle test requires an inmate to show that prison officials acted with deliberate indifference to his serious medical need. "Deliberate indifference" is more than mere malpractice or negligence; it is a state of mind equivalent to reckless disregard of a known risk of harm. Farmer v. Brennan, 511 U.S. 825, 837–38, 114 S. Ct. 1970, 128 L. Ed. 2d 811 (1994). Furthermore, a prisoner's subjective dissatisfaction with his medical care does not in itself indicate deliberate indifference. Andrews v. Camden County, 95 F. Supp.2d 217, 228 (D.N.J. 2000); Peterson v. Davis, 551 F. Supp. 137, 145 (D. Md. 1982), aff'd, 729 F.2d 1453 (4th Cir.

1984).  Similarly, "mere disagreements over medical judgment do not state Eighth Amendment claims."  White v. Napoleon, 897 F.2d 103, 110 (3d Cir. 1990).

Rather, to establish deliberate indifference, a prisoner must show that the defendant was subjectively aware of the unmet serious medical need and failed to reasonably respond to that need.  See Farmer, 511 U.S. at 837; Natale v. Camden Cnty. Corr. Facility, 318 F.3d 575, 582 (3d Cir. 2003).  Deliberate indifference may be found where the prison official: (1) knows of a prisoner's need for medical treatment but intentionally refuses to provide it; (2) intentionally delays necessary medical treatment based on a non-medical reason; or (3) deliberately prevents a prisoner from receiving needed medical treatment.  See Pierce v. Pitkins, 520 F. App'x 64, 66 (3d Cir. 2013) (citing Rouse v. Plantier, 182 F.3d 192, 197 (3d Cir. 1999)).

"[A] party may establish liability for deprivation of a constitutional right only through a showing of personal involvement by each defendant."  Farrar v. McNesby, No. 15-2019, 2016 WL 759571, at *2 (3d Cir. Feb. 25, 2016) (citing Rode v. Dellarciprete, 845 F.2d 1195, 1207 (3d Cir. 1988)).  "Personal involvement may be shown through personal direction, actual participation in the alleged misconduct, or knowledge of and

acquiescence in the alleged misconduct." <u>Id.</u>; <u>see also</u> <u>Tenon v.</u>
<u>Dreibelbis</u>, 606 F. App'x 681, 688 (3d Cir. 2015).

   **D.   Analysis**

   Plaintiff alleges that Defendants violated his Eighth
Amendment rights in the in the following ways:

   (1) After the altercation, Davenport and two unidentified
female correctional officers delayed his transport to a hospital
for about one hour in order to question him, causing him pain
and possibly contributing to his permanent eye injuries.[3]

   (2) After returning from the hospital in the early morning
of October 20, 2010, he was placed alone in a SHU cell and
permitted to sleep for several hours, in violation of the
hospital's discharge instructions.

   (3) SIS Technician Davenport and Lieutenant Daniel McCabe
delayed further medical treatment for more than an hour on
October 20, 2010, again attempting to question him and causing
him further pain and possibly contributing to his permanent eye
injuries.

   (4) Dr. Morales acted with deliberate indifference by: (a)
by allowing SIS Technician Davenport to delay his transport to a
hospital on October 19, 2010; (b) by allowing SIS Technician

---

[3] BOP records show that Davenport was not on duty at FCI Fairton
at the time of the physical altercation.

Davenport and Lieutenant McCabe to delay his medical treatment on October 20, 2010; (c) by failing to have Plaintiff monitored and awakened every two hours; (d) by failing to authorize an ophthalmologic evaluation that was recommended by the hospital discharge instructions; and (e) by failing to make Plaintiff's medical records available for a consultation with an Ear, Nose and Throat ("ENT") specialist and failing to authorize a second ENT consultation.

Defendants argue that Plaintiff failed to exhaust his administrative remedies prior to bringing suit against them, and this failure is fatal to his claims.  The Prison Litigation Reform Act of 1995 (PLRA), 42 U.S.C. § 1997e(a), mandates that an inmate exhaust "such administrative remedies as are available" before bringing suit to challenge prison conditions. Section 1997e(a) provides: "No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."  This language is mandatory.  Ross v. Blake, 136 S. Ct. 1850, 1856 (2016).

The only exception to the mandatory exhaustion requirement is that the administrative remedies must be "available."  A remedy is not considered available when it operates as a simple dead end, it is so opaque that it becomes incapable of use

because no ordinary prisoner can discern or navigate it, or when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation. Ross, 136 S. Ct. at 1859-60. A defendant must plead and prove failure to exhaust as an affirmative defense. Ray v. Kertes, 285 F.3d 287, 295 (3d Cir. 2002).

Defendants argue that even though Plaintiff filed administrative remedy requests while in SHU, none contained the complaints he has raised in the current action. Several of those remedy requests were not legible and returned to Plaintiff, and the ones that were accepted by BOP officials only concerned arguments challenging his punishment arising out of the October 19, 2010 altercation in the recreation area, and nothing relating to delayed or improper medical treatment.

Plaintiff counters that because he had no access to administrative forms, his medical records, or the law library while in SHU, his administrative remedies were not "available" in the three ways described in Ross. Plaintiff further argues that the remedy requests he did make while in SHU could be construed as involving the same claims he has asserted in this case. Defendants respond that (1) Plaintiff could have availed himself of all of these things, (2) he was aware of, and took advantage of, the administrative remedy procedure for his complaints about his discipline, and (3) the remedy requests he

filed involve the altercation but say nothing about his medical care.

"A primary purpose of exhaustion is to alert prison officials to a problem." Drumgo v. Radcliff, Sgt., 661 F. App'x 758, 761 (3d Cir. 2016) (citing Jones v. Bock, 549 U.S. 199, 219 (2007)). Moreover, as the Supreme Court in Ross noted, the three exceptions to the exhaustion requirement will not often arise because of a prison's own incentive to maintain functioning remedial processes. Id. at 1859. Thus, in this case, if Plaintiff wanted to confirm that he was receiving the proper treatment for his injuries, or complain about any delay in receiving treatment, the most appropriate time – and the most beneficial time - to do so would have been while he was in SHU, and during the same time he was filing administrative remedy forms related to his discipline for the incident. Such a course would have served the very purpose of the exhaustion requirement.

The Court has reviewed Plaintiff's administrative remedy forms, and even liberally construed, none can be considered to encompass the claims that Plaintiff has advanced in this action.[4]

_____

[4] The administrative remedy forms mainly concern the BOP's rejection of Plaintiff's claim that self-defense should mitigate his punishment. Any medical complaints contained in Plaintiff's administrative remedy forms are from 2013 and 2014 and concern a request for hernia surgery, the removal of tumor and biopsy, and treatment for low testosterone.

Without the application of any exception, it is clear that
Plaintiff failed to exhaust his administrative remedies.  See
e.g., Drumgo, 661 F. App'x at 761 ("[I]n a grievance filed on
the same day as the incident, Drumgo claimed only that the
corrections officer damaged his sneakers.  He did not mention
that a physical assault had occurred.  Therefore, because
Drumgo's grievance included no facts relevant to his claim of a
physical assault, we conclude that he failed to exhaust his
administrative remedies.") (citing Brownell v. Krom, 446 F.3d
305, 311 (2d Cir. 2006) (holding that a grievance for recovery
of lost property was insufficient to exhaust a claim for
intentional mishandling of property in retaliation for protected
conduct)).

To the extent that Plaintiff argues that he did not become
aware of the effects of his allegedly delayed and improper
medical care until after his transfer to another correctional
facility, and beyond the time any administrative remedies would
have been helpful, such a position is as unavailing for
Plaintiff's exhaustion exception argument as it is for the
substance of his Eighth Amendment violation claims.  For
exhaustion, this type of "discovery rule" does not fall into any
of the three exceptions to the mandatory exhaustion requirement
described in Ross, and does not show that the administrative
process was not available to Plaintiff.

As to the substance of Plaintiff's deliberate indifference claims, Plaintiff's belief that he was harmed by any delay in his treatment or mistreatment by Defendants is unsupported by any evidence other than his own beliefs, and, in any event, amounts to no more than claims of medical negligence, which are not cognizable under <u>Bivens</u> for Eighth Amendment violation claims.  <u>See Stewart v. Pennsylvania Department of Corrections</u>, --- F. App'x ---, *3 (Jan. 31, 2017) ("[Plaintiff complained] about the timeliness of the interventions - that Defendants initially misdiagnosed his fracture, resulting in its delayed treatment.  But such a diagnostic failure, at worst, amounts to medical malpractice, which is not actionable under the Eighth Amendment.  In addition, he pointed to a five-day period following his misdiagnosis during which he received no treatment - despite his request for it - and claimed to have been in significant pain. But deliberate indifference requires that a defendant knows of and disregards an excessive risk to inmate health or safety, and to avert summary judgment, [Plaintiff] must point to some evidence beyond [his] raw claim that [Defendants were] deliberately indifferent. This, he has not done.") (quoting <u>Kost v. Kozakiewicz</u>, 1 F.3d 176, 185 (3d Cir. 1993) ("[M]edical malpractice does not become a constitutional violation merely because the victim is a prisoner.")); <u>Lenhart v. Pennsylvania</u>, 528 F. 3d 111, 115 (3d Cir. 2013) ("Despite

Lenhart's request for a doctor, he was seen by a nurse and given two courses of antibiotic treatments. He claimed that his care was inadequate and that he should have been segregated from other detainees to limit the risk of infection. We agree with the District Court that . . . he merely disagrees with the care that he received and he did not state a claim of medical mistreatment.") (quoting Estelle v. Gamble, 429 U.S. 97, 106 (1976) ("[A] complaint that a physician has been negligent in diagnosing and treating a medical condition does not state a valid claim of medical mistreatment."); Monmouth Cnty. Corr. Inst. Inmates v. Lanzaro, 834 F.2d 326, 346 (3d Cir. 1987) ("[M]ere disagreement as to the proper medical treatment does not support a claim of inadequate medical care.")); Bramson v. Sulayman, 251 F. App'x 84, 86 (3d Cir. 2007) ("Bramson's complaint makes clear that the defendants treated him on many occasions. He claims those treatments proved ineffective and that defendants negligently failed to diagnose his heart condition, but those allegations do not state an Eighth Amendment claim.").

Plaintiff has not provided any evidence beyond his own beliefs that the alleged hour or two delay in treatment, the failure of someone to wake him every two hours the first night he returned from the hospital, and the failure to be referred to an ophthalmologist, served as an intentional refusal to provide

needed treatment, delayed necessary treatment for non-medical reasons, or prevented Plaintiff from receiving needed or recommended treatment, sufficient to constitute a deliberate indifference claim.

Indeed, to the contrary, Plaintiff received immediate treatment by the medical staff when he was discovered injured in the recreation yard, and was transported to the hospital in about an hour. Plaintiff was not questioned about the incident until the following day, and there is no indication that his questioning delayed any treatment. Dr. Morales was consulted by telephone about Plaintiff's condition that night, and he examined Plaintiff in the morning when he arrived the next day. Dr. Morales examined Plaintiff again two days later, and determined that Plaintiff's vision was not impaired, and no ophthalmology consult was needed at that time. Two weeks later, Dr. Morales determined that Plaintiff's condition warranted an ENT specialist consultation, which revealed normal findings. During this time, Plaintiff was seen multiple times, and he was encouraged to go to sick call if he had any problems, including any vision issues. Prior to his transfer, Plaintiff did not, however, complain of vision impairment or other improper treatment related to his injuries he sustained as a result of the October 19, 2010 incident.

The unrefuted evidence demonstrates that Plaintiff failed to exhaust his administrative remedies for the complaints he has raised in this action, and he otherwise cannot demonstrate that Defendants were deliberately indifferent to his serious medical needs in violation of his Eighth Amendment rights. Consequently, Defendants are entitled to judgment in their favor on all of Plaintiff's claims.

## CONCLUSION

For the foregoing reasons, the Court will grant Defendants' motion for summary judgment. An appropriate Order will be entered.

                                    s/ Noel L. Hillman
                                    NOEL L. HILLMAN
                                    United States District Judge

Date: April 7, 2017
At Camden, New Jersey